707 So.2d 142 (1998)
Harry T. BRITTON, Plaintiff-Appellant,
v.
CITY OF NATCHITOCHES, Defendant-Appellee.
No. 97-1038.
Court of Appeal of Louisiana, Third Circuit.
February 11, 1998.
Rehearing Denied April 3, 1998.
*143 George Arthur Flournoy, Alexandria, for Harry T. Britton.
Joseph B. Stamey, Natchitoches, for City of Natchitoches.
Keith Smith, for Office of Risk Management.
Before THIBODEAUX, GREMILLION and PICKETT, JJ.
THIBODEAUX, Judge.
The sole issue in this appeal is whether the Office of Workers' Compensation properly denied attorney fees to claimant, Harry Britton. Britton sought reinstatement of weekly disability benefits, penalties, and attorney fees after his former employer, the City of Natchitoches, reduced his benefits based upon its belief that Britton was no longer temporarily totally disabled, but was capable of earning at least minimum wages. It relied upon two physicians' approval of certain labor market surveys, which allegedly represented jobs that were available to Britton and that he was capable of performing. The workers' compensation judge held that the City of Natchitoches had not met its burden to reduce benefits. She reinstated full benefits and awarded penalties in the amount of $2,000.00 with interest from the date of judicial demand. The judge, however, denied claimant's request for attorney fees. We *144 hold that the judge committed manifest error in finding that the reduction of Britton's compensation benefits was not arbitrary, capricious, or without probable cause. Therefore, we reverse the judgment of the Office of Workers' Compensation and award attorney fees in the amount of $15,000.00 to plaintiff-appellant, Harry Britton.

I.

ISSUE
The sole issue in this appeal is whether the City of Natchitoches acted arbitrarily, capriciously, or without probable cause, in reducing Britton's weekly compensation benefits, thereby entitling him to reasonable attorney fees.

II.

FACTS
Britton was injured in a work-related accident on September 20, 1988, when he fell from a bucket during the course and scope of his employment with the City of Natchitoches. At the time of the accident, the 300 pound Britton was a thirty-five year old high school graduate who had completed only one semester of college. He had been employed by the City of Natchitoches for seventeen years and was the current foreman of the crew for the city's Department of Streets and Parks. He worked along with the crew and primarily hauled garbage, paved streets, and laid concrete.
Britton suffered back and left leg injuries as a result of the work-related fall. He received conservative treatment from Dr. Baer Rambach, an orthopaedic surgeon, for almost two years, until May 25, 1990, when Dr. Rambach performed back surgery. The procedure was described as a partial hemilaminectomy at L3-L4 and L4-L5 on the left side with exploration of disc and nerve roots at L3-L4 and excision of a herniated intervertebral disc at L4-L5. Britton's leg pain was successfully diminished as a result of the surgery, but he still complained of back pain after any prolonged sitting or standing. Consequently, he became accustomed to frequently having to shift his body position throughout the day.
The City of Natchitoches was apparently not convinced of Britton's disability because it terminated his weekly compensation benefits on April 5, 1990. While Britton awaited a hearing date to contest the action taken by the City of Natchitoches, he visited Dr. Rambach again on January 28, 1991. Dr. Rambach reported that he believed Britton had obtained a state of maximum medical improvement. He stated that it was highly unlikely that Britton could return back to any heavy physical work in the future, including his former position with the City of Natchitoches. Dr. Rambach stated his belief that Britton would be left with a thirty to thirty-five percent permanent partial physical impairment and loss of physical function of the lumbosacral spine as applied to the body as a whole. At that time, he suggested vocational rehabilitation and physical reconditioning.
Neither vocational rehabilitation nor reconditioning was provided by the servicing agents for the City of Natchitoches' compensation plan, Risk Management, Inc. (RMI). However, pursuant to a judgment dated August 23, 1991, Britton's benefits were reinstated and the City of Natchitoches was directed to pay weekly benefits until Britton became able to engage in any gainful employment. Britton was also awarded penalties, attorney fees, and the cost of all medical treatment rendered by Dr. Rambach.
There was no other action taken on Britton's case until February 1995, when Keith Smith, a senior adjuster for RMI, began reviewing Britton's file. He discovered that no action had been taken on the file and that Britton had been receiving weekly temporary total disability (TTD) benefits in the amount of $183.68. He requested that an independent medical examination (IME) be conducted by Dr. Gordon Mead, an orthopaedic surgeon, ordered surveillance of Britton by private investigators, and assigned a vocational rehabilitation consultant to work with Britton.
Dr. Mead conducted a musculoskeletal evaluation of Britton on May 8, 1995. Dr. Mead's impression was that Britton had postoperative *145 degenerative lumbar disc disease related to the original injury, and that he had reached maximum medical improvement. Britton now weighed 340 pounds and had not been employed since the date of the accident. He felt that Britton was capable of light or light/medium work, but that he could not do any repetitive bending, stooping, crawling, or climbing.
In October 1995, the claims adjuster ended the surveillance of Britton, after months had passed without him being able to obtain any prejudicial information. Dr. Mead was mailed a list of job descriptions prepared by the vocational rehabilitation consultants hired by the City of Natchitoches. He was asked to sign each description to signify his approval of the position as being suitable for Britton. Dr. Mead approved all of the job descriptions provided, which included: retail business manager, warehouse selector, hotel clerk, ginner, 911 dispatcher, gaming security person, van driver, and sales clerk. Dr. Mead evaluated Britton once more on April 30, 1996, and did not change his position as to Britton's ability to work.
A second IME was then sought by the City of Natchitoches in June of 1996. The Office of Workers' Compensation approved the request, in spite of opposition presented by Britton's attorney. Another orthopaedic surgeon, Dr. Edwin Simonton, was selected to conduct the examination. Dr. Simonton examined Britton on July 1, 1996, and essentially agreed with Dr. Mead's impression. He diagnosed Britton with postoperative degenerative joint disease at the lumbosacral joint. He believed he was capable of medium work activity, with no squatting, excessive bending, prolonged standing, or walking. He, too, believed Britton had reached maximum medical improvement, but felt that his weight, which was now in excess of 350 pounds, would be a contributing factor in his ability to increase his vocational opportunities. He was also provided with the job descriptions that had been approved by Dr. Mead and asked to give his approval of the positions he believed Britton was capable of performing. Dr. Simonton only approved the positions of sales clerk, 911 dispatcher, hotel clerk, and "possibly" van driver.
Notwithstanding these doctors' impressions, Dr. Rambach, who was Britton's treating physician, still believed that Britton remained totally disabled. He had examined Britton again on December 12, 1995, and learned that Britton's pain had increased since the surgery in 1990 and that he had gained excessive weight because of his sedentary lifestyle. He attributed the continued pain to scar tissue formation at the site of the disc removal and at the location where he had experienced a disc rupture at L4-L5. He felt that Britton's overall work prognosis was very poor and that he should be further evaluated. The City of Natchitoches never sought Dr. Rambach's approval of the job descriptions provided by the vocational rehabilitation consultants.
Britton visited Dr. Rambach again on August 1, 1996, and complained of increased pain and discomfort in the lower back. Dr. Rambach again felt that Britton remained totally physically impaired and unable to engage in any gainful work for wages for which he was educated to perform. He explained that his opinion regarding Britton's employability was based on his observations of Britton, whom he described as walking slowly, being grossly overweight, having restricted motion of the lumbosacral spine, and also having been unemployed for almost seven years. Dr. Rambach felt that physical reconditioning in the form of general physical therapy, trunk stabilization, and aerobic-type conditioning was needed first, before it could be decided if Britton could, in fact, perform the light or light/medium duty work that Drs. Mead and Simonton believed Britton to be capable of performing. Dr. Rambach made it clear that he believed Britton would be able to perform some level of activity in the future, so that he could obtain gainful employment again, but not until he had received physical reconditioning and vocational rehabilitation.
Nevertheless, on July 8, 1996, the City of Natchitoches sought to reclassify the benefits received by Britton to Supplemental Earnings Benefits (SEB), which are payable for injuries resulting in an employee's inability to earn wages equal to ninety percent or more of the wages he is earning at the time *146 of injury, in the amount of sixty-six and twothirds percent of the difference between the average monthly wages at time of injury and the average monthly wages earned or able to be earned by the employee in any month after the injury. See La.R.S. 23:1221(3)(a). Britton had been receiving TTD payments which were equal to sixty-six and two-thirds percent of his pre-injury wages. See La.R.S. 23:1221(1)(a). The City of Natchitoches also sought to reduce the benefits received by Britton, to $302.45 per month based on his ability to earn minimum wage. It relied solely upon Drs. Mead's and Simonton's signed approvals of job descriptions that had been provided by its vocational rehabilitation consultants, and offered them as being representative of the jobs that were currently available and capable of being performed by Britton. His benefits were reduced accordingly, effective on July 24, 1996.
Britton sought reinstatement of his benefits in the amount that had been previously judicially ordered, as well as penalties and attorney fees. After a hearing, the workers' compensation judge sustained the SEB classification and reinstated benefits on a zerobased earning capacity. She also awarded penalties. The judge explained orally that her decision to reinstate benefits to the amount paid before the reduction, rested on her finding that the City of Natchitoches had failed to meet its burden to reduce SEB. She stated that, at best, the vocational rehabilitation consultants had only provided labor market surveys or general job descriptions to Britton without showing that there were actual jobs reasonably available to him, as is required to achieve a successful reduction in SEB. However, the judge stated that she would not award attorney fees because she did not believe the actions of the City of Natchitoches to have been "arbitrary, capricious, unreasonable or in total disregard to the claimant." Britton instituted this appeal in which the sole issue is the denial of attorney fees.

III.

LAW AND DISCUSSION
We find the Office of Workers' Compensation's denial of attorney fees to be manifestly erroneous. See Stobart v. State, 617 So.2d 880 (La.1993). Workers' compensation claimants are entitled to attorney fees if benefits are discontinued arbitrarily, capriciously, or without probable cause. La.R.S. 23:1201.2. It is clear from the record that, from the time Britton's case was reviewed in 1995 after years of inactivity, the City of Natchitoches, through its servicing agent, RMI, exhibited a clear and definite goal to reduce and/or terminate the payment of compensation benefits to this claimant. The record showed that it, in pursuit of this goal, instituted undercover surveillance of this claimant from February 1995 to October 1995, and also used the vocational rehabilitation consultants it was required to provide for Britton, as its self-serving agents to assist it in discontinuing its payments to this claimant. We find that these methods were blatantly instituted in clear derogation of the spirit, if not the letter of workers' compensation laws, which are supposed to serve as remedial tools that are to be liberally construed in favor of an injured claimant. See Pinkins v. Cardinal Wholesale Supply, Inc., 619 So.2d 52 (La.1993).
We begin our analysis with a review of the relevant Louisiana workers' compensation statute that addresses the amount of SEB that is to be paid to a claimant. The amount of SEB is based upon the difference between the claimant's pre-injury average monthly wage and the claimant's proven post-injury monthly earning capacity. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840, (La.7/1/97); 696 So.2d 551; La.R.S. 23:1221(3)(a). It is clear that the City of Natchitoches sought a reduction in Britton's benefits by attempting to use the doctor-approved job descriptions, that were developed by its vocational rehabilitation consultants, as proof of Britton's post-injury earning capacity.
Unfortunately, the problem that this defendant and other employers and/or insurers have created is the practice of using vocational rehabilitation consultants for a purpose completely unintended by the workers' compensation statute. They are using vocational rehabilitation consultants to provide nothing *147 more than "sham rehabilitation" to injured employees, while simultaneously using them to assist in defeating an injured workers' claim. See Maxie v. Brown Indus., Inc., 95-19 (La.App. 3 Cir. 5/31/95); 657 So.2d 443, writ denied, 95-1630 (La.10/6/95); 661 So.2d 469. In this case, "sham rehabilitation" was used to establish earning capacity, which, as stated earlier, is necessary in efforts to defeat or reduce a claim for SEB.
As the workers' compensation judge correctly concluded in this case, earning capacity cannot be proven by an employer or insurer by only producing doctor-approved labor market surveys. See Pinkins, 619 So.2d 52; Banks, 696 So.2d 551. Rather, an employer "must prove, by a preponderance of the evidence, that the employee is [1] physically able to perform a certain job and that the [2] job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic region." Banks, 696 So.2d at 556 (emphasis added); La.R.S. 23:1221(3)(c)(i). Not only were these labor market surveys insufficient to establish Britton's earning capacity and to secure a reduction in SEB, they are evidence of "[t]his so-called client-counselor relationship [that] is a subterfuge whose apparent purpose is to advance the interests of the entity which is paying for the services." Maxie, 657 So.2d at 448.
The primary goal of vocational rehabilitation is to return a disabled worker to work efficiently and expediently with minimum retraining. La.R.S. 23:1226; see also Maxie, 657 So.2d 443 and Livings v. Langston Cos., Inc./Continental Bag Div., 96-636 (La.App. 3 Cir. 12/5/96); 685 So.2d 405. The Louisiana Rehabilitation Counselor Licensing Act states that the client-counselor relationship is one in which the counselor assists in defining vocational goals and designing an action plan based upon the client's interests, abilities, aptitudes, and needs. La.R.S. 37:3443(3)(a). "A thorough rehabilitation counselor will consult medical records, treating physicians, and, just as importantly, the client/injured employee. In addition, appropriate forms of skills and achievement tests should be utilized." Livings, 685 So.2d at 413. Consequently, vocational rehabilitation plays a crucial role in ascertaining entitlement to SEB and the amount to be paid to a claimant, because the vocational rehabilitation consultant is in a strategic position to determine the post-injury earning capacity of an injured claimant. Unfortunately, because employers are required to provide rehabilitation services to injured employees who are unable to earn wages equal to those earned before being injured, there has developed a use of vocational rehabilitation that is completely adverse to that described above. The vocational rehabilitation consultant is not undertaking his duties to assist in determining a realistic appraisal of access to employment. See Pinkins, 619 So.2d 52. Instead this type of "vocational rehabilitation" is "no more than a cruel diversion from the reality of the goals it ought to advance. Regrettably, the use of vocational rehabilitation `experts' has become a forensic tool on behalf of employers who use it to betray the salutary principles and obfuscate the ameliorative objectives of our workers' compensation laws." Maxie, 657 So.2d at 448. We find this behavior to have been repeated in this case as well.
To begin with, Keith Smith, the senior claims adjuster handling Britton's case, testified that he directed the vocational rehabilitation consultants as to what action to take in providing rehabilitation services. His control of the services rendered by the vocational rehabilitation consultants was evident as early as March 14, 1995. A memo to his file dated March 14, 1995, stated the following:
Discussed file with Dianne Jisly, voc rehab counselor assigned with Crawford. She wanted instructions. I told her to hold off until I get the surveillance as claimant suspects nothing at this time as he has been auto-paid for a long time. Told her he would get IME with Mead after the surveillance.
(Emphasis added).
This vocational rehabilitation counselor followed Smith's instructions and did not take any significant action towards providing required services to Britton until May 1995, when Smith advised her to meet with Dr. Mead, to identify vocational opportunities within Britton's abilities, and to get them *148 signed. Those job descriptions were compiled in October 1995 and subsequently given to Dr. Mead for his approval. He signed all of them.
In July 1996, Smith testified that, after he received Dr. Simonton's approval of those job descriptions that had been compiled as a result of the October 1995 labor market survey, he sought to change the status of Britton's benefits to SEB at $302.45 per month based on his ability to earn at least minimum wage. Smith was aware that, at that time, the surveys he relied on were not current. He testified that he knew Britton was still unemployed and had not been offered a job as of that date. Additionally, he was aware that Dr. Rambach, the treating physician, disagreed with the opinions of Drs. Mead and Simonton, both of whom had only conducted cursory evaluations of Britton. Nevertheless, once he received doctor-approved job descriptions, he did not hesitate to use this insufficient information to reduce or terminate Britton's benefits. The City of Natchitoches, through RMI, subverted the true meaning of vocational rehabilitation by dictating the methods in which the consultants provided services, so that the consultants worked for the primary purpose of helping it to discontinue payments to Britton, and not to assist Britton in becoming employable again.
These facts reflect the arbitrary and capricious manner in which the City of Natchitoches sought a reduction in benefits payable to Britton. In further support of our finding, the record contained Britton's testimony of the "sham rehabilitation" that provided more of a service to the City of Natchitoches than it did to him. He stated that he met with vocational rehabilitation counselors only twice in 1995, with one meeting lasting approximately two hours and the second lasting approximately one hour and fifteen minutes. In addition, the only other service provided to him by these rehabilitation counselors came in the form of four or five letters mailed in late 1995 and the last in January 1996. Although Britton denies receiving it, one letter was alleged to have been accompanied by a packet of materials containing information regarding resume preparation, interviewing skills and procedures, and information on completing job applications. The other letters contained listings of jobs that were alleged to be currently available in his area. Britton testified that he responded to each listing, but was never offered a job, and often was not able to complete job applications because the businesses listed were not hiring.
Notwithstanding these facts, the City of Natchitoches cites Crawford v. Al Smith Plumbing and Heating Service, Inc., 352 So.2d 669 (La.1977), for the proposition that where an employer relies upon competent medical advice in terminating benefits, that employer has not acted arbitrarily or capriciously. We agree that an employee is not entitled to statutory penalties in a workers' compensation case where his employer relied upon competent medical advice. See Hopes v. Domtar Indus., 627 So.2d 676 (La.App. 3 Cir.1993). However, we believe that the medical advice relied upon was only sufficient, at best, to establish that Britton was no longer totally and temporarily disabled. The job descriptions that accompanied the reports of the two doctors, however, were wholly inadequate assessments of his capabilities and were not reliable results upon which a determination as to Britton's actual earning capacity could rest. We see here, as we did in Maxie, 657 So.2d at 448, that "[t]he counselors in this case did nothing to effectuate... rehabilitation. Their efforts did not correlate with their stated objective of assisting... to attain `vocational independence.' Instead, they were used for `exclusively partisan litigation purposes.'" (Citation omitted).
We conclude that the actions taken by the City of Natchitoches in attempting to achieve a termination of Britton's compensation benefits were arbitrary, capricious, or without probable cause. Therefore, we award him attorney fees in the amount of $15,000.00. This attorney fee award is particularly suitable in the present case because the actions of the City of Natchitoches exemplify the type of egregious behavior on the part of an offending party, such as employers' and insurers' indifference toward injured employees, that an award of attorney fees *149 was intended to deter. Hood v. C.J. Rogers, Inc., 94-1162 (La.App. 3 Cir. 3/8/95); 654 So.2d 371. Moreover, an award of attorney fees is a type of penalty that does not serve the purpose of making the injured party whole, but rather is intended to punish and deter particularly egregious behavior. See Sharbono v. Steve Lang & Son Loggers, 97-110 (La.7/1/97); 696 So.2d 1382 (affirming, in dicta, this court's recognition of an award of attorney fees as being a type of penalty). The amount of an award of attorney fees should, hence, be measured in relation to the culpability or bad faith exhibited by the offending party. See Iron Workers Local No. 272 v. Bowen, 624 F.2d 1255 (5th Cir.1980) (listing "the degree of the opposing parties' culpability or bad faith" as one of the five factors a court should consider in awarding attorney fees).
Bad faith can be committed in a number of different manners and is formally defined as:
[G]enerally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.
Black's Law Dictionary, 94 (6th ed. 1991).
We find that the City of Natchitoches clearly presented an example of textbook-defined bad faith in this instance. This bad faith was exhibited by the adjuster's inappropriate directions to the rehabilitation counselor, advising her to define jobs Britton was capable of doing and to get them signed by Dr. Mead, its chosen medical examiner. There was no discussion about identifying Britton's skills and abilities and assisting him in achieving job placement, which is the true goal of vocational rehabilitation under La. R.S. 23:1226. Further, the City of Natchitoches exhibited bad faith in failing to offer any rehabilitative assistance to the disabled plaintiff for approximately four years. Instead of providing prompt rehabilitative services as it is required to provide under La. R.S. 23:1226, the City of Natchitoches took no action whatsoever towards attempting to assist Britton in reentering the workforce. Yet, when it discovered its own four-year oversight, the immediate response was to take steps to collect evidence that would provide grounds for discontinuing payments. The adjuster ordered undercover surveillance of the disabled Britton beginning in March 1995 and ending in October 1995 after months had passed without any of the desired information having been obtained. What we find particularly egregious, as well, is the adjuster's directions to the vocational rehabilitation counselor to initially hold off in providing services of any sort to Britton until results were obtained from the pending surveillance.
The bad faith does not end there. It is also evident in the City of Natchitoches' actions in directing the vocational rehabilitation consultant to meet with its IME rather than Dr. Rambach, Britton's treating physician. The adjuster admitted in his deposition that this was not normal procedure. However, he attempted to justify the action by stating that this direction was given because of the years that had passed without Britton having been examined by his treating physician. Also, he contended that it was the injured employee's responsibility to have himself examined by his own physician. We do not agree. These inadequate explanations are poorly veiled attempts to cover an attitude of indifference and unjustified skepticism towards Britton and the existence of his already proven injuries.
We also base the amount of the award on the factors typically used to determine attorney fees: the degree of skill and ability exercised, the amount of the claim, the amount recovered, and the amount of time devoted to the case. Naquin v. Uniroyal, Inc., 405 So.2d 525 (La.1981); Thibodeaux v. Woman's Hosp. of Acadiana Foundation, Inc., 578 So.2d 213 (La.App. 3 Cir.1991). Britton's counsel has worked since 1991 to ensure that he was afforded the guarantees of this state's workers' compensation laws. His counsel fought successfully for the reinstatement of his benefits before the Office of Workers' Compensation in 1991. Thereafter, he challenged a request for a second IME sought by the City of Natchitoches and represented Britton at the hearing. He later challenged the reduction in Britton's benefits *150 and successfully represented him in the trial of the matter. His involvement in that trial included, but was not limited to, deposing four witnesses, three of whom were orthopaedic surgeons, and also examining three witnesses during the two-day trial. Finally, Britton's attorney instituted this appeal on his behalf, prepared and submitted a wellreasoned and thorough brief in support of this effort, and presented a well-articulated argument to this court.
We also considered Britton's ability to hire counsel in our determination of the amount of attorney fees to be awarded. "While a worker's ability to hire counsel is not a listed factor in setting attorney's fees, we find it a valid consideration in workers' compensation cases." Jones v. Evangeline of Natchitoches, Inc., 97-869, p. 10 (La.App. 3 Cir. 12/10/97); 704 So.2d 905, 909. We find it relevant that Britton's wife testified at the 1996 hearing for reinstatement of her husband's benefits, that she was now the primary provider for the family. She stated that her husband was a very good provider before the accident. Unfortunately, their family, which includes a daughter who is currently in college, is now being supported by the benefits received by Britton and his wife's income as a poultry inspector for ConAgra. Consequently, we believe it proper to take into consideration the additional economic burden suffered by Britton as a result of having to hire counsel to represent him in these workers' compensation matters.
For the reasons assigned, the judgment appealed from is reversed and set aside in so far as it denies attorney fees to plaintiff-appellant, Harry Britton. Britton is awarded $15,000.00 in attorney fees and all costs of this appeal are assessed to defendant-appellee, the City of Natchitoches.
REVERSED AND RENDERED.